48 F.3d 1227
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 Maria E. ESPINOZA, Gilbert Espinoza, Mary Ellen Cale,
guardian ad litem, Plaintiffs-Appellees,
v.
Brian DUNN; Geody Okamoto; Patrick Martin; Dan Smith,
Defendants-Appellants.
 Nos. 91-56353, 91-56389 and 92-56018.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 7, 1993.
Decided Jan. 18, 1995.
 
 Appeal from the United States District Court for the Central District of California; No. CV-89-5615-JSL; J. Spencer Letts, District Judge, Presiding.
 C.D.Cal.
 REVERSED AND REMANDED.
 Before: FLETCHER, PREGERSON and HALL, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Defendants, four deputies in the Los Angeles County Sheriff's Department, appeal the jury verdict against them in this civil rights action. They challenge evidentiary rulings made in the course of trial. We reverse.
 
 BACKGROUND
 
 3
 The Espinozas claim sheriff's deputies Brian Dunn, Patrick Martin, Geody Okamoto, and Dan Smith, violated their rights under 42 U.S.C. Secs. 1983 and 1985 by arresting them without probable cause, using excessive force during the arrests, and falsifying police reports to cover up their actions.
 
 
 4
 At trial, Gilbert Espinoza testified that on the night of September 17, 1988, he attended a party where a quarrel broke out between two girls. While Gilbert was trying to break up the fight out on the street, the police were called, and sheriff's deputies arrived in three police cars. After he obeyed police commands to kneel in the street beside the radio car, Gilbert was verbally harassed by the deputies. One deputy told Gilbert that he "didn't like [his] smart ass," and took him off to a second car. There, the deputy kicked open Gilbert's legs for a search, pulled down on his testicles, banged his head and chest against the vehicle, handcuffed him, made derogatory remarks about Mexicans, and threw him into the car.
 
 
 5
 While in the car, Gilbert saw deputies harassing his sister, and hitting her with an object that looked like a flashlight. He yelled at the officers to stop, and told them his sister was pregnant; when they did not respond, he kicked at the inside of the car door and hit it with his shoulder. Deputies Dunn and Smith then entered the car, pushed Gilbert down on the seat, and tied his legs to his handcuffs. They took him from the car and dropped him repeatedly onto the ground from a height of three or four feet. Eventually, they hit him across the head with a flashlight, and he blacked out.
 
 
 6
 The defendants told a very different story. They testified that when they arrived at the scene, they saw Gilbert chasing two youths with a stick; that after Gilbert was placed in the car, he began hitting his head against the passenger window and the rear window and screaming profanities; that he rolled over to kick at the glass; that Dunn, Martin, and Okamoto removed him from the car to keep him from damaging it or himself; that after the car door was opened, Gilbert began flailing with his legs; and that when he was taken outside of the car he kicked and twisted about as the officers held him down and attempted to put restraints on his legs. It was at that time that Deputy Martin struck Espinoza in the back and rib cage with his "sap."
 
 
 7
 The jury returned a verdict for the plaintiffs. It found that Deputies Dunn, Martin, and Okamoto had violated Gilbert Espinoza's civil rights, and that Gilbert had suffered damages in the amount of $2477--the sum total of his medical expenses. The jury assessed $20,000 in punitive damages against Martin and $5000 each against Dunn and Okamoto.[1] The jury also found that Deputy Smith had violated Maria Espinoza's civil rights, and awarded $611 in actual damages (medical expenses) and $2000 in punitive damages.
 
 
 8
 After the conclusion of most of the deputies' testimony, the court asked defendants if they could bring to the court building a car similar to the one in which Gilbert had been placed. The next court day, when defendants had done so, the trial judge explained that he wanted his law clerk to sit in the car and form an opinion as to whether there would be any value in having the jury view it. Defense counsel objected to any viewing on the ground that the car was not on plaintiffs' exhibit list; the court explained that this was not an issue because any demonstration would be at the court's behest.
 
 
 9
 Three days later, the court reviewed with counsel the "undisputed facts" on which the demonstration would be based. RT 6/14/91 at 2407-19. When defense counsel objected to various aspects of the proposed demonstration, the court explained its rationale for the demonstration: "I will not tolerate before me testimony that is not objectively possible. I will test what is objectively possible." Id. at 2419.
 
 
 10
 The next court day, the trial judge discussed logistics with defense counsel, explaining that he would orchestrate the viewing and that a law clerk would perform the demonstration. Defense counsel objected to the procedure as a whole, but told the court that the defendants were willing to participate in the demonstration insofar as it related to Gilbert's movements inside the car.
 
 
 11
 At some point, whether on that same day or earlier, the law clerk performed a preliminary inspection of the car, and was unable to strike her head against the rear window.[2] The trial judge thereafter informed the jurors that there would be a demonstration. He told them that he had decided that it would be "unnecessarily difficult" for them to consider the evidence relating to Gilbert's arrest and placement in the car without seeing the car and seeing somebody in the car. RT 6/17/91 at 113. The judge also explained that one purpose of the demonstration was to attempt to refresh the deputies' memories, but that the jurors should not, in their own minds, put the deputies on the spot. Finally, the court described some limitations on the scope of the demonstration. There would be no attempt to reproduce the struggle, and there would be no effort to reproduce "the manner of putting down," in part because the testimony on this point was not altogether consistent.
 
 
 12
 The demonstration was held in a parking garage. On site, the court explained to the jury that the law clerk was roughly the same size as Gilbert had been at the relevant time. The court also explained that the clerk would not be doing any kicking or thrashing, although "there [wa]s testimony about a lot of kicking and a lot of thrashing." RT 6/17/91 ("Viewing") at 4. The clerk then put her hands behind her back, got into the car, and attempted to bang her head against the rear window. Apparently she was unable to do so. The court invited any defendant whose memory had been refreshed to add to his testimony. Instead, defense counsel handcuffed Deputy Okamoto, who got into the car and banged his head against the rear window. The court asked if the jurors had taken note, pointing out that "the place the head struck" was an area of "potential conflict," and noting that Deputy Okamoto was taller than the law clerk. RT 6/17/91 ("Viewing") at 9.
 
 
 13
 The clerk then got back into the car. The court again asked the deputies if their recollection was refreshed, and pointed to positions around the car where the deputies, consistent with their testimony, would have been standing on the night of the incident. The clerk was lifted out of the car by two fellow clerks; according to defense counsel, she lay limply in their arms. She was placed on the ground; the positions of the deputies around her were indicated; she was told to kick. Defense counsel posited that the bulk of the kicking had taken place in the air. Soon thereafter, the demonstration ended.
 
 JURISDICTION
 
 14
 Plaintiffs contend that a defect in defendants' notice of appeal deprives this court of jurisdiction over the appeals of all but one of the defendants: the caption of defendants' notice of appeal refers to only one of the deputies by name--"Brian Dunn et al."
 
 
 15
 In Torres v. Oakland Scavenger Co., 487 U.S. 312, 317-18 (1988), the Supreme Court, applying the requirement of Fed.R.App.P. 3(c) that a notice of appeal "specify the party or parties taking the appeal," held that the appellate court lacked jurisdiction over the appeal of the one intervenor whose name did not appear on the notice of appeal--despite the fact that the caption contained the words "et al." After Torres was decided, however, Fed.R.App.P. 3(c) was amended: the rule now provides that an attorney representing appellants may satisfy the requirements of Rule 3(c) "by describing those parties with such terms as 'all plaintiffs,' 'the defendants,' 'the plaintiffs A, B, et al.,' or 'all defendants except X.' " Before Rule 3(c) was amended, we reached much the same result in Benally v. Hodel, 940 F.2d 1194 (9th Cir.1990). In Benally we held that, notwithstanding Torres, we had jurisdiction over the appeals of all plaintiffs where the notice of appeal was captioned "[Plaintiff] et al.," and where the body of the notice contained a generic reference to "plaintiffs." Id. at 1197.
 
 
 16
 In light of Benally, we need not determine here whether or not the amendment to Fed.R.App.P. 3(c) applies retroactively. The notice of appeal in this case is structurally identical to the notice of appeal in Benally: here too defendants are referred to in the caption of the notice of appeal by "et al." and in the body of the notice of appeal generically. We conclude we have jurisdiction over the appeals of all four defendants.
 
 DISCUSSION
 
 17
 1. The Vehicle Demonstration: Dissimilarity
 
 
 18
 Defendants contend that the vehicle demonstration was not illustrative of their testimony, and that therefore the district court abused its discretion by admitting it. "[A] court may properly admit experimental evidence if the tests were conducted under conditions substantially similar to the actual conditions." Champeau v. Fruehauf Corp., 814 F.2d 1271, 1278 (8th Cir.1987) (internal citations omitted); see also Hinds v. General Motors Corp., 988 F.2d 1039, 1048 (10th Cir.1993); Smith & Wesson v. United States, 782 F.2d 1074, 1083 (1st Cir.1986). At the same time, the court notes in Champeau "perfect identity between actual and experimental conditions" is not required. "Ordinarily dissimilarities affect the weight of the evidence, not its admissibility." Champeau, 814 F.2d at 1278.
 
 
 19
 We conclude that in this case the actual and the experimental conditions were so dissimilar that the test should not have been performed. We focus on the initial subject of the demonstration: head-banging. The law clerk performing the demonstration was told not to "kick and thrash," although the testimony was that "this whole time [Gilbert] was moving around in the vehicle and yelling and screaming and kicking doors." RT 5/24/91 at 722. The dissimilarity between actual and experimental conditions in this case was of such a nature as to create a discernible risk that the demonstration was seriously misleading. In the absence of kicking and thrashing on the part of the law clerk, what may have been physically possible in the real world (hitting of the head on the rear window) may have been impossible in the experiment. In the face of that dissimilarity, the similarities on which the demonstration was premised--the make of the car and the size of the person[3] inside it--are relatively unimportant. The very physical possibilities the court wished to test may have depended upon the element excluded from the demonstration.[4]
 
 
 20
 We recognize that "the admissibility of [demonstration] evidence lies largely in the discretion of the trial judge," Champeau, 814 F.2d at 1278, and that "the trial judge is ... the first and best judge whether conditions of the experiment are sufficiently similar and enlightening to render the testimony based thereon admissible." Derr v. Safeway Stores, Inc., 404 F.2d 634, 639 (10th Cir.1968). In this case, however, dissimilarity is glaringly apparent on the face of the record. More to the point, that dissimilarity may have been dispositive in determining the outcome of the experiment: while plaintiffs argue that the head-banging demonstration was damaging but fair, since it merely revealed the falseness of the deputies' testimony, in fact the dissimilarity may have lead the jurors to erroneously conclude that the deputies' version of the events was physically impossible. Quite simply, while a stationary law clerk could not bang her head on the rear window, a clerk thrashing about as Gilbert allegedly did might well have been able to do so. If so, the inference the jurors were invited to draw (i.e., that the deputies were lying) would have been incorrect. In a case like this, where "the circumstances of the [incident], as alleged, are so different from [the] test as to make the results largely irrelevant if not misleading," reversal is warranted. Gladhill v. General Motors Corporation, 743 F.2d 1049, 1051-52 (4th Cir.1984) (reversing on other grounds, and directing trial court to exclude evidence of test results on retrial).[5]
 
 
 21
 2. The Vehicle Demonstration: Judicial Involvement
 
 
 22
 Defendants also point to a second and more profound flaw in the demonstration. The demonstration was originated, planned, previewed, stage-managed, and performed entirely by the court and court staff.
 
 
 23
 While no case we are aware of expressly permits trial courts to order and perform demonstrations, we assume that the district court had authority to order the demonstration here. See Fed.R.Evid. 614(a) (trial court authorized to call witnesses); Fed.R.Evid. 614(b) (trial court authorized to question witnesses called by the parties). That authority, however, is not unlimited: a judge's authority under Rule 614 "is, of course, abused when the judge abandons his proper role and assumes that of advocate." Advisory Committee Note on Rule 614(b).
 
 
 24
 In determining whether or not the district court exceeded that limit here, we find guidance in United States v. Patterson, 652 F.2d 1046 (D.C.Cir.), cert. denied, 454 U.S. 904 (1981). In that case, defendant complained that the trial judge had interjected himself improperly into the proceedings by cross-examining defendant's alibi witnesses, apparently to the detriment of their credibility. In affirming the conviction, the D.C. Circuit expounded on what it called a "prospective analysis." The court stated that in assessing the actions a trial judge takes to impose order onto a trial, "it is critical to the inquiry to remember that [those] actions must always be viewed prospectively." 652 F.2d at 1048. Thus on appeal, it was not dispositive that the trial judge's questioning had damaged the credibility of defendant's witnesses, because when that question was viewed prospectively, it was clear that "the reverse result could have manifested itself and strengthened the credibility of [the] witnesses." Id. (emphasis in original).
 
 
 25
 The same cannot be said here. The trial judge did not order the demonstration blind. Before the test was performed for the jury, the law clerk inspected the car. Three days before the trial judge discussed logistics with counsel, he stated "I want my law clerk, Ms. Thompson, to just get in it and form an opinion if there would be any value in doing a viewing of it. If she thinks the answer to that is yes, I'll think about it. If she thinks the answer to that is no, unless somebody wants me to think about it, I won't." RT 6/11/91 at 1933. Thus while the trial court later told counsel that "I haven't formed an opinion," and that "I have deliberately refr[ained] from forming an opinion," RT 6/17/91 at 6, the record suggests that the "form[ing of] an opinion" by court staff was a prerequisite for the demonstration.[6] In light of the trial court's explanation for conducting the demonstration--"I will not tolerate before me testimony that is not objectively possible"--the record also suggests that the district court's conclusion was that the demonstration would undermine the defendants' story. This does not appear to be a case in which "the reverse result could have manifested itself and strengthened the credibility of [the] witnesses." Patterson, 652 F.2d at 1048.
 
 
 26
 Once the trial judge had made the decision to conduct the experiment, he made every effort to conduct it fairly. He repeatedly reminded the jurors that they were the finders of fact, and that their recollection of testimony should take precedence over his. In addition, he gave defense counsel and defendants every opportunity to correct his version of defendants' testimony if they found he had misstated anything.
 
 
 27
 Nevertheless, we conclude that the district court committed reversible error. The court was unwilling to perform the demonstration without first determining what the results of the experiment were likely to be. Pre-screening the evidence in this fashion is the role of an advocate, not a judge. We cannot escape from the clear impression created by the record that the result of the evidence introduced by the district court was predetermined, and that the cards were stacked against the defendants by the one player who was bound to treat them with impartiality.
 
 
 28
 We conclude that the error was not harmless. The outcome turned entirely on credibility. If the jury believed that the demonstration proved the defendants lied about the cause of Gilbert Espinoza's head injuries, the verdict could have turned on that belief. Because of our conclusion in this regard we do not find it necessary to reach the many other issues raised. We therefore reverse.
 
 
 29
 REVERSED AND REMANDED.
 
 
 30
 PREGERSON, Circuit Judge, dissenting.
 
 
 31
 I dissent. My review of the evidentiary rulings at issue leads me to conclude that on balance--considering the length of the trial, the complexity of the issues, and the overall result--the district court did not abuse its discretion. I would, however, remand on the attorneys fee issue to eliminate the multiplier.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this Circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 At oral argument, plaintiffs' counsel informed the court that Gilbert Espinoza has died during the pendency of the appeal. Counsel also stated that under California law, Gilbert's claim for damages based on pain and suffering does not survive his death, although Gilbert's claim for punitive damages does survive his death. Cal.Code Civ.Proc. Sec. 377.34
 
 
 [2]
 Defendants suggest that this happened on June 17, 1991, which was after the arrangements discussed above had already been made. But the record indicates that the clerk at least looked at the car (even if she did not then sit in it) days earlier--that is, on the first day defendants brought it to court, and before the court had made any arrangements with counsel. RT 6/11/91 at 2049 (court said to defense counsel, "If you will, take her down there"); RT 6/14/91 at 2407 (defense counsel refers to the "same car that your Honor's law clerk looked at")
 
 
 [3]
 The record does not reflect whether the strength and musculature were or were not substantially similar, except we do know the clerk was female
 
 
 [4]
 The defendants' own subsequent demonstration did not cure this problem. Although Deputy Okamoto was able to bang his head against the rear window, the court was quick to point out that Okamoto was taller than both the law clerk and Gilbert
 
 
 [5]
 We recognize that the district court pointed out to the jury that the element of kicking and thrashing was left out of the demonstration, and that the court stated that "We are not making any effort to reproduce what actually happened." RT 6/17/91 at 116. We cannot, however, conclude that these remarks were curative. At a later point in the demonstration, the court, in the presence of the jury, invited the defendants to "make their own demonstration of this because it is [their] version." RT 6/17/91 ("Viewing") at 15. This latter comment reintroduced the suggestion that the demonstration was intended to be a reenactment of defendants' testimony. Moreover, even in the absence of that comment, and even assuming that the demonstration was meant "merely to demonstrate general principles of physics," Champeau, 814 F.2d at 1278, the demonstration should not have been performed. It is plain physics that a body in motion behaves differently than a stationary one. As the Fourth Circuit recognized in Gladhill, "[i]t is possible to call almost any evidence of this type 'a demonstration to illustrate a principle,' " but when conditions are "dissimilar in such fundamental and important respects that the risk of prejudice to [one party] outweigh[s] the probative value of the evidence," the evidence must be excluded. 743 F.2d at 1052
 
 
 [6]
 As discussed in note 2, supra, it is less than clear when the law clerk first examined the car. The record suggests that the law clerk at least looked at the car long before the district court made any arrangements for the actual demonstration; appellants' brief, however, suggests that she did not sit in the car until the day of the demonstration, and after the arrangements had been made (although before the jury was told that there would be a demonstration). But even if the clerk's first contact with the car was on the day of the demonstration, the trial court clearly previewed the evidence. It performed the demonstration itself before announcing to the jury that a demonstration would be made. Its presentation of evidence to the jury thus was not neutral from a prospective point of view